

Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Philip G. Reinhard | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 50322 | **DATE** | 9/24/2002 |
| **CASE TITLE** | | Gauger vs. Hendle, et al. | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

Defendant prosecutors' motion for summary judgment and motion to strike;
defendant detectives' motion for summary judgment

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated on the attached Memorandum Opinion and Order, defendant prosecutors' motion to strike is denied, and the prosecutors' and detectives' motions for summary judgment are granted in part and denied in part. The remaining federal claims in Counts 1, 2, 3, and 5 of the amended complaint are dismissed. The court also reaffirms its prior dismissal of those claims identified in the court's order of March 27, 2000 [18]. All of plaintiff's federal claims are now dismissed in their entirety. The court declines to exercise supplemental jurisdiction over the supplemental state law claims. This case is hereby dismissed in its entirety.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. |
|---|---|
| | No notices required. |
| X | Notices mailed by judge's staff. |
| | Notified counsel by telephone. |
| | Docketing to mail notices. |
| X | Mail AO 450 form. |
| X | Copy to judge/magistrate judge. |

number of notices

SEP 25 2002
date docketed

docketing deputy initials

9-24-02
date mailed notice

CLERK
U.S. DISTRICT COURT

02 SEP 24 PM 3: 32

/LC
courtroom deputy's initials

Date/time received in central Clerk's Office

mailing deputy initials

Document Number

105



# United States District Court
## Northern District of Illinois
### Western Division

Gary A. Gauger

v.

Beverly Hendle, et al.

**JUDGMENT IN A CIVIL CASE**

Case Number: 99 C 50322

☐     Jury Verdict. This action came before the Court for a trial by jury. The issues have been tried and the jury rendered its verdict.

■     Decision by Court. This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED that defendant prosecutors' motion to strike is denied, and the prosecutors' and detectives' motions for summary judgment are granted in part and denied in part. The remaining federal claims in Counts 1, 2, 3, and 5 of the amended complaint are dismissed. The court also reaffirms its prior dismissal of those claims identified in the court's order of March 27, 2000 [18]. All of plaintiff's federal claims are now dismissed in their entirety. The court declines to exercise supplemental jurisdiction over the supplemental state law claims. This case is hereby dismissed in its entirety.

All orders in this case are now final and appealable.

FILED-WD
02 SEP 24 PM 3:32
CLERK
U.S. DISTRICT COURT

Michael W. Dobbins, Clerk of Court

Date: 9/24/2002

Susan M. Wessman, Deputy Clerk

GARY A. GAUGER,                          )
                                         )
          Plaintiff                      )
                                         )
     v.                                  )    No. 99 C 50322
                                         )
BEVERLY HENDLE, MELVIN HUNT, EUGENE      )
LOWERY, JAMES MCAULIFF, GARY PACK,       )
CHRISTOPHER PANDRE, PHILIP PROSSNITZ,    )
and CHARLES TERRELL, in their            )
individual and official capacities,      )
KEITH NYGREN in his official capacity,   )
LINDA SCHALZ, as administrator and       )
executrix of the estate of MATT SCHALZ,  )
the OFFICE OF THE MCHENRY COUNTY         )
SHERIFF, the OFFICE OF THE STATE'S       )
ATTORNEY OF MCHENRY COUNTY, THE COUNTY   )
OF MCHENRY, and all others not           )
presently known,                         )
                                         )
          Defendants.                    )

## MEMORANDUM OPINION AND ORDER

### I.   INTRODUCTION

Having been wrongfully convicted of murdering his parents
and spending nearly three years in jail for crimes he did not
commit, plaintiff, Gary A. Gauger, has filed a fourteen-count
amended complaint against various defendants involved in his
prosecution.  After this court dismissed some of these claims
early on in the case, what remains are the following:  claims
brought under 42 U.S.C. § 1983 against Beverly Hendle, Eugene
Lowery, and Christopher Pandre (collectively referred to as "the
detectives") for malicious prosecution (Count 1) and failing to

disclose exculpatory evidence to the prosecuting attorneys (Count 2); a § 1983 claim against James McAuliff, Gary Pack, and Philip Prossnitz (collectively referred to as "the prosecutors") for failing to disclose exculpatory evidence to Gauger (Count 3); a § 1983 claim against the McHenry County Sheriff's Department ("MCSD") for failing to train its officers regarding the proper interrogation of suspects and preparation of reports reflecting such interrogation (Count 5); and Illinois common law claims against the detectives for malicious prosecution (Count 8) and conspiracy (Count 10), against the prosecutors for conspiracy (Count 11), against both the detectives and the prosecutors for intentional infliction of emotional distress (Count 9), and against McHenry County and the MCSD for indemnification (Counts 12 and 13, respectively). Jurisdiction and venue are proper based on 28 U.S.C. §§ 1331, 1367, 1391. Before the court are the detectives' and prosecutors' separate motions for summary judgment, filed pursuant to Federal Rule of Civil Procedure 56, and the prosecutors' motion to strike.

## II.  **BACKGROUND**

### A.  **Motion to Strike**

Before turning to the actual facts in this case, the court first must take up the prosecutors' motion to strike. The prosecutors accuse Gauger of violating Local Rule ("LR") 56.1 by including additional facts in his response to their LR 56.1(a) statement of facts and by not specifically denying or admitting

some of their facts but merely objecting to them on evidentiary grounds. They thus ask the court to strike the offending paragraphs of Gauger's response. As a matter of principle, the court agrees that some of Gauger's "responses" to the prosecutors' facts really do raise new matters that should have been included in a statement of additional facts under LR 56.1(b)(3)(B). Nevertheless, because the prosecutors were able to adequately reply to Gauger's additional facts, and the court's own review of the evidence was not hampered by Gauger's manner of presenting his additional facts, the court denies the prosecutors' motion to strike. Still, the court warns Gauger's counsel in the future that a response to an opposing party's statement of facts must be limited to merely denying or admitting those facts (along with, of course, citations to the record supporting any denials); any additional matters must be set forth in a separate statement of additional facts. (The court similarly reminds Gauger's counsel about LR 7.1, as Gauger's response brief to the prosecutors' motion for summary judgment was more than fifteen pages but did not include a table of contents or a table of cases.)

## B. **Facts**

On the afternoon of April 9, 1993, MCSD officers took Gauger in for questioning in connection with the death of his parents, Ruth and Morry Gauger, whose bodies had been found earlier that day in separate locations on their 214-acre farm in Richmond,

Illinois. (Detectives' LR 56.1(a) ¶¶ 4, 7, 32, 42, 46) Gauger
himself had discovered his father dead inside a garage near the
farmhouse that Morry used as a motorcycle shop; a few hours later
MCSD officers found Ruth dead inside a trailer, also next to the
farmhouse, that she used for storing and selling rugs. (Id. ¶¶
5, 6, 32, 42) "Foul play" was suspected and it soon became
apparent Ruth and Morry had been murdered. (Id. ¶ 40) In fact,
their deaths were particularly gruesome and, as it was learned
later, each had been killed in similar fashion. Both were
forcefully hit on the head two or three times, probably with the
butt of a gun, and then slashed across the neck once or twice
with a knife. Morry additionally had been stabbed in the back
once. (LR 56.1(b) ¶¶ 36, 38, 40, 42, 44; Detectives' Reply Exh.
B, pp. 41-43)

Upon arriving at the MCSD station, the detectives
interrogated Gauger for some eighteen hours, from roughly 4:30
p.m. until 10:20 a.m. the next morning. (Detectives' LR 56.1(a)
¶¶ 50-51) During the course of this interrogation Gauger
verbally "confessed" (more on this below) to killing his parents,
although he refused to sign any written statement to that effect.
(Id. ¶¶ 77-78, 81-83 & Pl. Resp. ¶ 81) Hendle and Lowery
subsequently prepared their own reports about the interview and
"confession." (Detectives' LR 56.1(a) ¶ 93)

It did not take long after that for a grand jury to indict
Gauger for the double homicide. (Id. ¶ 104) On October 21,

-4-

1993, a jury found him guilty of murdering his parents. (Id. ¶ 108)  Three months later, on January 11, 1994, the state trial court judge sentenced Gauger to death, only to vacate that sentence on September 22, 1994, and impose instead two sentences of life imprisonment without the possibility of parole. (Id. ¶¶ 108-09)  Gauger then appealed his conviction to the Illinois Appellate Court.

While his direct appeal was pending, Sandy DeValkenaere, an agent with the Bureau of Alcohol, Tobacco, and Firearms ("ATF") in Milwaukee, called the MCSD on September 11, 1995, and spoke with detective Charles Terrell (a named defendant in this case who was previously dismissed). (Prosecutors' LR 56.1(a) ¶ 30) For the last year or so, DeValkenaere had been investigating illegal activities involving members of the Outlaw motorcycle gang, including several bombings and murders that fell within ATF's jurisdiction. (Id. ¶ 17)  She explained to Terrell that an "informant" (who was in fact a member of the Outlaws by the name of Mark Quinn, although she didn't tell Terrell this at the time) had come forward during her investigation and told her he had information that two other members of the Outlaws committed the Gauger murders. (Id. ¶ 32)  But DeValkenaere also impressed upon Terrell that the information was extremely confidential, the informant would be in mortal peril if he were compromised, and he should not share the information with any one except on a need to know basis. (Id. ¶ 34)

A week later, on September 18, 1995, Terrell spoke with DeValkenaere again. (Id. ¶ 38) He relayed some details about the Gauger murders to her that was not consistent with some of the information Quinn had given her, causing her to become more suspicious of Quinn and to think he either did not have accurate information or he was lying to her. (Id. ¶ 39) Terrell then asked if he could personally meet with the informant but DeValkenaere refused. (Id. ¶ 40) Eventually, though, DeValkenaere agreed to let Terrell interview the informant during a conference call. This occurred on October 31, 1995, at which time Quinn gave Terrell accurate descriptions of Ruth and Morry and their vocations, said that he had met Gary on one occasion and described him, gave the descriptions and names of the two Outlaw members he said had committed the murders, who were Randy Miller and James Schneider, and related what Miller had told him about the manner and time frame of the murders. (Id. ¶ 42 & Pl. Resp. ¶¶ 42, 45; Pl. Exh. 12, pp. 1-4) At the end of the conversation, DeValkenaere told Terrell he could inform his immediate supervisor and the McHenry County State's Attorneys Office about the information, but that he should still limit it to only those people who absolutely needed to know. (Prosecutors' LR 56.1(a) ¶ 43)

Accordingly, Terrell met with Pack, the McHenry County State's Attorney, on November 30, 1995, to tell him what he had learned, although it is unclear exactly how much detail Terrell

went into. (Id. ¶ 45 & Pl. Resp. ¶ 45) A few months later, on January 23, 1996, Terrell had a similar meeting with Prossnitz and McAuliff, the two Assistant State's Attorneys who actually prosecuted Gauger during his criminal trial, to update them on the information Terrell had received from ATF. (Prosecutors' LR 56.1(a) ¶¶ 52-55) Afterwards, the three prosecutors met among themselves to talk about what, if anything, they should do with the information from the federal officers, including – most importantly for this case – whether to turn it over to Gauger or his counsel. (Id. ¶ 58) In the end, they decided not to do so for a number of reasons. First, they wanted to honor the ATF's request to keep the information confidential so as not to risk the informant's life, obstruct a federal investigation, or compromise the investigation itself which might lead to more information. Second, they believed the information was not material, exculpatory, or sufficiently reliable. (Id. ¶¶ 59-61)

Then on March 8, 1996, the Illinois Appellate Court reversed Gauger's conviction in an unpublished order, holding that Gauger was in custody when the officers originally took him in for questioning but that they lacked probable cause to do so. It also held Gauger's incriminating statements made during the interrogation should have been excluded because they were "fruits of [the] illegal arrest." (Id. ¶ 68; Prosecutors' Exh. U, Illinois v. Gauger, No. 2-94-1199, slip op. at 27-29 (Mar. 8, 1996 Ill. App. Ct.)) The court remanded the case for a new

trial.  (Id., slip op. at 30)

A few weeks later, on March 19, 1996, a meeting took place between Pack, McAuliff, Terrell, the undersheriff for the MCSD, an ATF agent (not DeValkenaere), and an Assistant U.S. Attorney from Milwaukee by the name of Paul Kanter.  At this meeting Kanter played a tape of a conversation Quinn had secretly recorded between himself, Miller, and Schneider just a few days before, on March 15, 1996.  Kanter also provided Pack with a transcript of the conversation.  Read in context – ATF had purposely given Quinn a copy of a news article describing the appellate court's recent decision in Gauger's case so Quinn could safely bring up the subject with Miller and Schneider – the conversation undeniably revolved around the Gauger murders, with Miller at one point saying to Schneider, "'Figgy' [the president of the Janesville, WI chapter of the Outlaws] never told Wolf [another Outlaw member who the Outlaws knew was cooperating with ATF] you and I did it.  He swore up and down he never did."  (Prosecutors' LR 56.1(a) ¶ 79 & Pl. Resp. ¶ 79)  A few moments later Schneider says, "Shit, Molly [Schneider's girlfriend] knows."  (Id.)

In early April 1996, Terrell traveled to Milwaukee and obtained from DeValkenaere another transcript of a second recorded conversation between Quinn and Miller that took place on March 25.  (Prosecutors' LR 56.1(a) ¶ 100)  Once again the Gaugers were the topic of discussion, with Miller going on at

length about how "There's nobody knows about that. I'm not worried about that. . . . There's not one bit of my evidence there. I had stuff on, I kept my hair fucking clean. . . . I had this all fuckin' covered. . . . There's nothing. . . . There's nothing, there's no way they could ever put me there. . . . I'm not even worried about that. Somebody could say, 'Hey, I saw him there,' and the cops would laugh at him 'cause there's no physical evidence from me there, there's none." (<u>Id.</u> ¶ 98 & Pl. Resp. ¶ 98) After receiving a copy of this transcript, Pack believed it may have showed some "guilty knowledge" on the part of Miller and Schneider, but did not think the two transcripts were exculpatory of Gauger. (Prosecutors' LR 56.1(a) ¶ 105) He consequently still felt it was not necessary to disclose any of the federal information to Gauger's counsel. (<u>Id.</u> ¶ 106)

Meanwhile the state had filed a motion to reconsider with the Illinois Appellate Court. That motion was denied on April 18, 1996. (<u>Id.</u> ¶ 107) A month later, on May 23, 1996, the state filed a petition for leave to appeal with the Illinois Supreme Court. (<u>Id.</u> ¶ 114)

While that petition was pending, Pack obtained in June 1996 a copy of another transcript from two conversations Quinn had with Miller that same month, both of which further implicated Miller in the Gauger murders. (<u>Id.</u> ¶¶ 115-117) ATF and the U.S. Attorney's Office reiterated their request that Pack not disclose any of this information for fear of jeopardizing Quinn's life and

the investigation itself.  (<u>Id.</u> ¶ 118)

Later that month, Pack decided to recommend Gauger be released on home monitoring.  (<u>Id.</u> ¶ 120)  He did this, according to his deposition testimony, because the Illinois Appellate Court had already denied the motion to reconsider and, without Gauger's confession, he did not believe he would have sufficient evidence to convict Gauger again.  (<u>Id.</u> ¶ 119)  He apparently made this decision without regard to the information from the federal officers, as he also testified that he never believed the evidence had reached a point where he had an obligation to turn it over.  (<u>Id.</u> ¶ 120)  In any event, Pack called Kanter and DeValkenaere to tell them what he was going to do and that he would be disclosing some of the information to Gauger's counsel, although he would not disclose specifics, such as the activities of Miller and Schneider or anything that might lead to Quinn's identity.  (<u>Id.</u> ¶ 121)

In early July 1996, Pack contacted Gauger's criminal defense attorney, told him that another law enforcement agency was developing information that could help Gauger but that Pack could not discuss it, and said he was going to give Gauger "the benefit of the doubt" by releasing him on home monitoring pending the outcome of the Illinois Supreme Court's decision on the state's petition for leave to appeal.  (<u>Id.</u> ¶ 122)  Gauger was released on August 2, 1996.  (<u>Id.</u> ¶ 125)  On October 3, 1996, the Illinois Supreme Court denied the petition for leave to appeal, prompting

Pack to nolle pross the case against Gauger.  (Id. ¶ 126)

It does appear (although the record is not entirely clear)
Schneider pled guilty in 1998 in a Milwaukee federal court to,
among other things, the murders of Ruth and Morry Gauger.
(Detectives' Reply Exh. B)  At that time, Schneider recounted the
graphic details of how he and Miller had committed the murders.
(Id.)  The record does not show what happened to Miller.

### III.  ANALYSIS

Summary judgment is proper when "the pleadings, depositions,
answers to interrogatories, and admissions on file, together with
the affidavits, if any, show there is no genuine issue of
material fact and that the moving party is entitled to judgment
as a matter of law."  Fed. R. Civ. P. 56(c); Bennett v. Roberts,
295 F.3d 687, 694 (7th Cir. 2002) (citing Celotex Corp. v.
Catrett, 477 U.S. 317, 322-23 (1986)).  The court's function is
not to weigh the evidence but merely determine if there is a
genuine issue of fact for trial.  See Bennett, 295 F.3d at 694
(citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249
(1986)).  In performing that task, the court views the evidence
and draws all reasonable inferences in the light most favorable
to the nonmoving party.  See id.

### A.    Section 1983 Claims against the Detectives (Counts 1 and 2)

In his response brief, Gauger wisely abandons his § 1983
malicious prosecution claim against the detectives (Count 1) due

to the Seventh Circuit's opinion in <u>Newsome v. McCabe</u>, 256 F.3d 747 (7th Cir. 2001), a case decided after Gauger filed this action. Count 1 is therefore dismissed in its entirety. Moving on, Gauger clarifies Count 2 is limited to a claim that the detectives deliberately withheld from their reports certain exculpatory information about the circumstances surrounding his interrogation.

During his interrogation, Gauger says the detectives used a variety of techniques to extract the false confession from him. For example, they lied to him when they told him he had failed a lie detector test even though the test was actually inconclusive. (LR 56.1(b) ¶¶ 10-13)  At one point, Gauger testified, one of the detectives (Hendle) pretended the State's Attorney was in the hallway talking about the death sentence. (<u>Id.</u> ¶ 18)  They also repeatedly told him they had a "stack of evidence" against him, such as bloody fingerprints, a bloody knife, bloody sheets, and bloody clothing they had found in Gary's bedroom (when in fact they had no such evidence at all.) (<u>Id.</u> ¶¶ 15, 17-20, 24)  Not understanding how he could have killed his parents without remembering it, Gauger told the detectives he would create a "hypothetical" account of what he would have done if he had killed his parents – simply to help jog his memory. (<u>Id.</u> ¶ 27)  He did so but then said this was just a scenario and did not actually remember doing any of it. (<u>Id.</u> ¶ 28)  A few hours later, Gauger repeated the hypothetical scenario, this time

-12-

providing more details because, according to him, he was simply repeating the details of the murders the detectives had fed him earlier. (Id. ¶¶ 34-35; Detectives' LR 56.1(a) Pl. Resp. ¶¶ 81-82) But because he still had "absolutely no memory of this," he again refused to sign a confession. (LR 56.1(b) ¶ 34)

When Hendle and Lowery wrote up their reports about the interrogation, however, they did not mention the "confession" was really just a "hypothetical scenario" to help Gauger jog his memory or that he did not remember killing his parents and also did not disclose their lies about the polygraph or the "stack of evidence." And this, as Gauger sees it, is where the detectives went wrong. He says they "deliberately excluded" their interview tactics from their reports, meaning they had given the prosecutors a slanted and one-sided account of his "confession." He admits the "detectives were legally free to mislead, deceive, and outright lie to [him]" to get him to confess. But once they did, Gauger insists, "due process required them to advise the prosecutors of their tactics, manipulations, and statements to Gauger, so as to provide the material context for his statements." (Pl. Resp., p. 13) Unfortunately for Gauger, this theory does not have much support in the case law.

It is true enough that police officers can be held liable for deliberately withholding "information or evidence necessary for the fair and impartial trial guaranteed by the U.S. Constitution." Ienco v. City of Chicago, 286 F.3d 994, 999 (7th

Cir. 2002); see also Newsome, 256 F.3d at 752 (holding that officers who withhold exculpatory evidence from prosecutors can be liable under § 1983); Jones v. City of Chicago, 856 F.2d 985, 993-94 (7th Cir. 1988) (holding police officers who deliberately conceal exculpatory information and supply misleading information to prosecutor can be liable under § 1983). The just-quoted language from Ienco seems to conclusively tie a police officer's duty to disclose exculpatory evidence to the prosecutors with the criminal defendant's right to a fair trial – essentially applying the rule of Brady v. Maryland, 373 U.S. 83 (1963), to police officers (except that police officers are responsible only for disclosing to prosecutors, not defendants; it is the prosecutors who, under Brady, must disclose exculpatory information to defendants). Newsome supports this interpretation as well, where the court linked an officer's failure to disclose exculpatory information with the prosecutor's Brady obligations. A prosecutor is "responsible for learning of and disclosing all exculpatory evidence known to the police," so if an officer is not candid with the prosecutor – i.e., he withholds exculpatory evidence from the prosecutor – and thereby prevents the prosecutor from complying with Brady, then the criminal defendant has not received a fair trial, "for Brady identifies a trial right." Newsome, 256 F.3d at 752. This focus on a fair trial would seem to signal a slight shift from Jones, which held in part that the Chicago police department's practice of maintaining

-14-

"street files" — retaining exculpatory information in clandestine files deliberately concealed from prosecutors and defense counsel — violated the rule of Brady. See Jones, 856 F.2d at 995. But as to the individual officers, the court spoke only of whether their nondisclosure and falsification of evidence influenced the initial decision to prosecute, to pursue an indictment, and ultimately to drop charges - not whether plaintiff received a fair trial. See id. at 993-94.

Gauger himself insists his claim against the detectives "hinges not on the prosecutors' decision to charge, but on the deprivation of his right to a fair trial under Brady." (Pl. Resp., p. 13) But if this is correct, and Ienco and Newsome suggest it is, then Gauger has no claim. This is because, as the detectives point out, their nondisclosure could not possibly have denied Gauger a fair trial because he already had all of the nondisclosed evidence in his possession. See, e.g., United States v. Morris, 80 F.3d 1151, 1170 (7th Cir.) (holding no Brady violation occurs where the information is available to defendant through the exercise of reasonable diligence, especially where defendant knew as much about the exculpatory evidence as the prosecution team itself did), cert. denied, 519 U.S. 868 (1996). Gauger was obviously at his own interrogation and knew all about the detectives' "tactics, manipulations, and statements." Indeed, it is undisputed Gauger himself testified at a suppression hearing before the state trial court judge and the

trial itself about his version of what happened and what the detectives said and did to him during the interrogation. (Detectives' LR 56.1(a) ¶¶ 106, 107 & Pl. Resp. ¶ 107)  It thus makes no sense to say Gauger was denied a fair trial because the detectives did not disclose this information to the prosecutors – not when he already had it in the first place.  (What's more, he was likely the *only* one with this information as the detectives naturally have their own version of the interrogation and it is not surprisingly at odds with Gauger's version.)

In any event, no matter how the issue is framed, Gauger's theory still suffers from a more fundamental flaw.  To repeat, Gauger admits that everything the detectives did during his interrogation was within constitutional limits.  This is probably a wise concession.  See, e.g., United States v. Ceballos, – F.3d –, No. 01-3715, 2002 WL 1968309, at *13 (7th Cir. Aug. 27, 2002) (stating that police officers have "considerable latitude in playing on the guilt and fears of the person interrogated in order to extract a confession that he will shortly regret having given" and officers may "actively mislead" a defendant in order to obtain a confession).  But if that is so, why should the detectives have to tell the prosecutors about something the courts say they can do anyway?  Prosecutors are obviously aware of the cases that sanction the use of psychological tricks to make a suspect confess, so for detectives to "disclose" that they used such trickery on a particular suspect only tells the

prosecutors what they must already assume. And in this sense, a detective who "withholds" from prosecutors the fact that he deceived or lied to a suspect during an interrogation is certainly not "seeking to mislead or misdirect the prosecutors and the defense." Newsome v. McCabe, 260 F.3d 824, 825 (7th Cir. 2001) (opinion on denial of petition for rehearing). To put it another way, by tricking or deceiving Gauger into confessing that he murdered his parents, the detectives did exactly what the courts countenance; thus, their failure to tell the prosecutors they did what the law says they may do hardly rises to the level of deliberately withholding highly material or exculpatory evidence.

One final reason for granting summary judgment on this claim is that "police need not spontaneously reveal to prosecutors every tidbit that with the benefit of hindsight (and the context of other evidence) could be said to assist defendants" and "need not automatically engage in debriefing sessions with prosecutors." Id. Yet this is exactly what Gauger's theory would require. For an officer to report every little trick, manipulation, statement, or tactic he used during an interrogation, he would practically have to supply a verbatim transcript of the interrogation. Doing so might be good public policy, but it is not constitutionally required. Indeed, other than citing cases like Ienco, Newsome, and Jones for the general proposition that police are constitutionally required to turn

over exculpatory evidence to the prosecution, Gauger does not identify a single point of authority for the more specific rule he proposes: that "[o]nce the detectives misled, deceived, and outright lied to [him] . . ., due process required them to advise the prosecutors of their tactics and statements to [him] (e.g., lying about evidence), so as to provide the material context for his statements." (Pl. Resp., p. 22) Even a generous reading of the three cases just mentioned does not arguably support such an idea. At the very least then, the detectives are entitled to qualified immunity because, even if it were found that police officers have a duty to disclose all of the psychological games and deceptions they used on a suspect to extract a confession, such a duty was not "clearly established" in April 1993. That is, the state of the law at that time would not have given the detectives "fair warning" that their conduct violated Gauger's constitutional rights. See generally Hope v. Pelzer, 122 S. Ct. 2508, 2516-17 (2002).

**B.    Section 1983 Claim against the MCSD (Count 5)**

Having found the detectives did nothing wrong in writing up their reports about Gauger's interrogation, Gauger's § 1983 claim against the MCSD, brought under the rule of Monell v. Department of Social Services, 436 U.S. 658 (1978), and its progeny, for maintaining a "policy, practice, and custom of not preparing timely reports of information exculpatory of suspects and defendants, and . . . of failing to adequately train its law

-18-

enforcement personnel with respect to . . . preparing accurate reports [of interrogations]" (Am. Compl. ¶ 99) must necessarily be dismissed as well.  See Treece v. Hochstetler, 213 F.3d 360, 364 (7th Cir.) (holding that municipality's liability under § 1983 is derivative of the individual officer's liability, so if individual officer is not liable on the underlying substantive claim, then municipality cannot be liable under Monell), cert. denied, 531 U.S. 957 (2000).

## C.    Section 1983 Claim against the Prosecutors (Count 3)

Like his cause of action against the detectives, Gauger has brought a Brady-type claim against the prosecutors, although predicated on different facts.  He argues the prosecutors violated their duty to disclose exculpatory evidence by not turning over the information obtained from the federal investigation while his direct appeal, and then the state's motion for reconsideration and petition for leave to appeal, were pending.  The basis for this claim is the idea that Brady applies equally to evidence first discovered after trial, and the prosecutors themselves seem to concede the point.  (Prosecutors' Reply, p. 2)  But the court is not at all sure this is the right way to frame the issue.

It is true that some courts, while reviewing a petition for habeas corpus, have held Brady requires the post-conviction disclosure of newly-discovered favorable evidence to a defendant, including while a direct appeal is pending.  See Smith v.

<u>Roberts</u>, 115 F.3d 818, 819-20 (10th Cir. 1997) (direct appeal pending); <u>Thomas v. Goldsmith</u>, 979 F.2d 746, 749-50 (9th Cir. 1992) (state has duty to disclose exculpatory evidence under <u>Brady</u> during a habeas corpus proceeding); <u>Monroe v. Butler</u>, 690 F. Supp. 521, 522-23, 525-26 (E.D. La. 1988) (holding that state's failure to disclose exculpatory evidence discovered after conviction violated habeas petitioner's <u>Brady</u> rights), <u>aff'd</u>, 883 F.2d 331 (5th Cir.), <u>cert. denied</u>, 487 U.S. 1247 (1988). Some marginal support for this extension of <u>Brady</u> can also be found in an isolated statement in <u>Pennsylvania v. Ritchie</u>, 480 U.S. 39 (1987), to the effect that "the duty to disclose [exculpatory information] is ongoing." <u>Id.</u> at 60, <u>cited in</u> <u>Roberts</u>, 115 F.3d at 820. Read in context, though, it is clear that applying <u>Brady</u> to the post-conviction disclosure of exculpatory information is hardly what the Court had in mind. Instead, it was merely making the point that the state has a continuing obligation to turn over exculpatory information throughout the pretrial phase of a case. It goes on to say in that same sentence quoted above: "information that may be deemed immaterial upon original examination may become important as the proceedings progress, and the court would be obligated to release information material to the fairness of the *trial*." <u>Ritchie</u>, 480 U.S. at 60 (emphasis added). <u>Brady</u>, after all, is premised on the Constitution's fair *trial* guarantee. <u>See</u> <u>United States v. Ruiz</u>, 122 S. Ct. 2450, 2454-55 (2002); <u>Newsome</u>, 256 F.3d at 752 ("<u>Brady</u> identifies a

trial right"). And evidence discovered *after* trial obviously
cannot be said to have affected a criminal defendant's right to a
fair trial, or even a currently pending appeal as the appellate
court is necessarily limited to the evidence adduced *at trial*.
Cf. Roberts, 115 F.3d at 820; Monroe, 883 F.2d at 333. Thus,
despite the few cases cited above and the parties' agreement on
the issue, the court has been unable to find any definitive
authority that Brady provides the proper framework for analyzing
Gauger's claim against the prosecutors.

This does not mean the court believes Gauger has no
constitutional claim at all. To the contrary, one of the
principal cases discussed by both parties, Houston v. Partee, 978
F.2d 362 (7th Cir. 1992), cert. denied, 507 U.S. 1005 (1993), at
least implies that the type of claim Gauger has brought here is
cognizable under § 1983. In Houston, the plaintiffs were
wrongfully convicted of murder but later secured their release
after obtaining certain evidence that showed they were not the
killers. They then sued the prosecuting attorneys under § 1983,
alleging the prosecutors had learned of the exculpatory evidence
while their direct appeals were pending with the state appellate
court but failed to disclose it then or anytime throughout their
post-conviction proceedings. The only issue before the court,
however, was whether the prosecutors were entitled to absolute
immunity (more on this below), so it did not discuss the
constitutional basis for plaintiffs' claim. It did not, in fact,

even so much as mention <u>Brady</u>.  But implicit in the court's

decision to let the case go forward is the premise that the

plaintiffs suffered some sort of constitutional injury, whatever

it may be.  The court came close to saying this when it

explained, in the context of discussing absolute immunity, that

the plaintiffs' injury did not depend on any judicial decision,

but on the fact that "[e]very day that the prosecutors failed to

disclose the exculpatory evidence was a day that [the plaintiffs]

were wrongly imprisoned."  <u>Houston</u>, 978 F.2d at 368 n.4.

It seems to the court then that Gauger's claim is really one

of wrongful imprisonment, or, to put it in constitutional terms,

it is, arguably, the deprivation of his liberty without due

process of law.[1]  That is, after convicting Gauger of double

homicide, the prosecutors allowed him to remain in prison without

telling him about evidence they had that tended to prove his

innocence and that he could have used to gain his freedom.  Apart

from any other obstacles such a claim might run into, the court

finds it does, at a minimum, involve a genuine constitutional

tort unrelated to any sort of <u>Brady</u> violation.

---

[1]  "Arguably" only because neither <u>Houston</u> nor any other
case the court is aware of has satisfactorily described how such
a claim – the nondisclosure of exculpatory evidence obtained
after a criminal defendant has been convicted – fits within the
framework of the Constitution.  As the court has already
explained, it does not believe <u>Brady</u> is the answer because that
case is based on a defendant's fair trial right, something that
Gauger's type of claim against the prosecutors does not
implicate.  With no other authority pointing the way, the court
believes the Fourteenth Amendment's due process clause is the
constitutional anchor for this claim.

## 1. **Absolute immunity**

Among other things, the prosecutors argue they are entitled to absolute immunity for not disclosing the federal information. It is well-established that prosecutors are entitled to absolute immunity when they deliberately suppress exculpatory evidence at trial. See Imbler v. Pachtman, 424 U.S. 409, 431 n.34 (1976); Houston, 978 F.2d at 365. It is much less clear, however, how this rule applies to the suppression of exculpatory evidence *after* trial, while the criminal defendant's direct appeal is pending. Houston itself dealt with this problem and held that, although prosecutors are normally entitled to absolute immunity for acts done in post-conviction proceedings, those who are not "involved in the post-conviction proceedings" — that is, those who are not "personally prosecuting the appeal" — are not absolutely immune from suit. Houston, 978 F.2d at 366. But exactly how much, or how little, involvement in the post-conviction proceeding is enough to confer, or deny, absolute immunity? Houston only provided a few details about the prosecutors in that case: their names were not included in the state appellate court's opinion, none of them filed the state's brief or argued the appeal, and the prosecution of the plaintiffs' appeal had been "passed on to others in the State's Attorney's office." Id. at 366 & n.3. No other case helps clarify the level of personal involvement necessary to grant absolute immunity in this context. Cf. Carter v. Burch, 34 F.3d

257, 263 (4th Cir. 1994) (distinguishing Houston and granting absolute immunity as it was uncontradicted that when the defendant-prosecutor learned of the exculpatory evidence, he was personally handling plaintiff's criminal post-conviction motions and initial direct appeal), cert. denied 513 U.S. 1150 (1995).

In this case, the prosecutors seek absolute immunity by arguing they were involved in certain aspects of Gauger's post-conviction proceedings, such as "providing input on the State's appellate brief and oral argument, and the decisions to file a motion to reconsider and petition for leave to appeal . . . ." (Prosecutors' Memo., pp. 22-23)  As an initial matter, though, the prosecutors have lumped themselves together under the umbrella of absolute immunity, when in fact there are some crucial differences between them.  Indeed, they concede in their reply to Gauger's statement of facts that Prossnitz and McAuliff had absolutely no role in Gauger's direct appeal.  (Prosecutors' LR 56.1(a) Pl. Resp. ¶ 16 & Prosecutors' Reply ¶ 16)  So no matter what standard the court applies, these two defendants are not entitled to absolute immunity based on their nonexistent role in Gauger's appeal, at least not under the reasoning of Houston.[2]

_____

[2]  The prosecutors also collectively argue they should receive absolute immunity because they evaluated the exculpatory evidence "for the sole purpose of determining whether [Gauger] should be released or retried."  (Prosecutors' Memo., p. 20)  They say that because they were evaluating the evidence for the purpose of initiating a judicial proceeding — a motion to release Gauger pending the outcome of the petition for leave to appeal — they were "performing prosecutorial functions."  (Id.)  Once again, though, it is undisputed that, although the three

-24-

That leaves Pack, who, as the McHenry County State's Attorney, had final reviewing authority over the appellate brief being filed in Gauger's direct appeal by the appellate prosecutor's office. (Prosecutors' LR 56.1(a) ¶ 16) Pack also testified that he spoke with the appellate prosecutor's office "a lot" about the state's brief, gave "a lot" of input into its contents, and discussed "quite a deal" with the deputy director of the appellate prosecutor's office, William Browers. (Id.; Prosecutors' Exh. B, Pack dep., pp. 63-65) Although the appellate prosecutor's office handled the actual oral argument, Pack's name was on the brief and Pack discussed the contents of that argument with Browers. (Id.) Pack and Browers also discussed whether to file the motion to reconsider with the Illinois Appellate Court. (Prosecutors' LR 56.1(a) ¶ 83) Finally, Pack told Browers to prepare the petition for leave to appeal and personally approved it after Browers drafted it. (Id.

---

prosecutors discussed together whether to turn over the federal information to Gauger's defense counsel, there is no evidence that Prossnitz and McAuliff discussed with Pack whether to recommend Gauger's release, which decision Pack made on his own. (Prosecutors' LR 56.1(a) ¶¶ 120-124) Thus, Prossnitz and McAuliff again cannot ride on Pack's coattails.

To be candid, though, it seems to the court that Prossnitz and McAuliff should be entitled to absolute immunity for the actions they took in their prosecutorial capacities, such as evaluating the evidence and deciding whether it should be turned over, regardless of whether they were involved in Gauger's appeal. Nevertheless, the court is bound to follow what it understands the lesson of Houston to be: that prosecutors who fail to disclose exculpatory evidence obtained while the criminal defendant's appeal is pending, but who are not personally involved in handling that appeal, are not entitled to absolute immunity.

¶ 114) Gauger is not able to contradict any of this evidence, although he does challenge the inferences to be drawn from it. The court, however, believes these facts, when taken together, show that Pack, unlike the prosecutors in Houston, was sufficiently personally involved in prosecuting Gauger's direct appeal, throughout the entire appellate process, so as to be absolutely immune from failing to disclose the exculpatory evidence.

Alternatively, assuming Pack is not entitled to absolute immunity, the court finds he, as well as Prossnitz and McAuliff, are nevertheless entitled to qualified immunity for the reasons discussed in the following section.

### 2. **Qualified immunity**

In deciding whether to grant the prosecutors qualified immunity, the court first considers the "threshold question" of whether, taking the facts in the light most favorable to Gauger, the prosecutors' conduct violated his constitutional rights. See Saucier v. Katz, 533 U.S. 194, 201 (2001). If such a violation could be made out on a favorable view of the evidence, then the next step is to ask whether the constitutional right at issue was clearly established, such that a reasonable official would understand that what he was doing violated that right. See id.; Morrell v. Mock, 270 F.3d 1090, 1094 (7th Cir. 2001). As the Supreme Court put it in Hope, this second inquiry means that prior court decisions must give the officials "fair warning" that

their conduct was unconstitutional. Hope, 122 S. Ct. at 2516.

The court has already intimated that it believes the facts of this case, taken in Gauger's favor, establish a constitutional violation. To begin with, the court is simply at a loss to understand how the prosecutors can argue with a straight face that, even after reviewing all of the evidence they obtained from the federal investigation *collectively*, it remained "preliminary and speculative." (Prosecutors' Memo., p. 5) They similarly insist the evidence was "preliminary" after they received the second transcript in which Miller went on and on about how he didn't leave any physical evidence at the Gaugers' house. (Id. p. 9) They further describe the recorded conversations as nothing more than "cryptic, vague statements" of a "gang member bragging about a crime he may or may not have committed." (Id., p. 16) The prosecutors do not score many points with the court by trying to downplay the obvious significance of the transcripts.

To be fair, it is at least arguable the initial information the prosecutors received — when Terrell told them in November 1995 and then again in January 1996 what DeValkenaere and Quinn had told Terrell about what Miller and Schneider had told Quinn — was not especially reliable. At that point, it was third or fourth-level hearsay, there could still be some legitimate doubt about Quinn's credibility and motivation for coming forward, and some of the evidence was uncorroborated. But once the

prosecutors obtained the transcripts from the recorded conversations in March-April 1996, they then had Miller and Schneider directly implicating themselves in the murders. For the prosecutors to claim this evidence was still "cryptic and vague" so as not to warrant being turned over to Gauger is not well taken. In the court's opinion, it is reasonable to conclude that the evidence by that point exculpated Gauger.

But what about the fact that the prosecutors did not receive these transcripts until *after* the Illinois Appellate Court reversed Gauger's conviction? The court does not see how this matters. The appellate court had remanded the case for a new trial and its mandate would not take effect until the Illinois Supreme Court denied the state's petition for leave to appeal some seven months later. This meant Gauger was not simply free to go home after the appellate court reversed his conviction, but instead remained in jail for another two and a half months or so, from early April 1996 when the prosecutors obtained the second transcript until July 1996 when they finally told Gauger's counsel about the federal information and agreed to recommend that Gauger be released on home monitoring, all the while still in the dark about the evidence the prosecutors were withholding. It was not until August 2, 1996, that he was finally released.

More importantly, the court believes the prosecutors' failure to disclose that evidence violated Gauger's right to due process. Gauger had been convicted for two murders, for which he

was serving two life sentences without the possibility of parole. While his direct appeal proceedings were in progress, the prosecutors who prosecuted him learned about and eventually had in their hands (literally) evidence that undeniably tended to prove his innocence. In such a situation, they could not let him be deprived of his liberty without disclosing that evidence to him, so he could make some use of it in trying to obtain his own freedom. Due process required at least that much.[3]

But the prosecutors did in fact turn over at least a redacted version of the exculpatory evidence some three months before the Illinois Supreme Court denied the petition for leave to appeal. Thus, the issue in this case is not whether the prosecutors should have turned over the evidence at all, but whether they did so in a timely manner. Even more specifically, under the second prong of the qualified immunity test, the question is whether it was clearly established in 1996 that the prosecutors violated Gauger's due process rights when they received evidence tending to exonerate Gauger while his direct appeal was pending but waited until the appellate process was

---

[3] The court is not aware, as it alluded to in footnote 1, of any case law that specifically recognizes such a constitutional right – a convicted prisoner's right to receive evidence obtained by the government after trial that tends to prove his innocence – based on due process, as opposed to Brady and the right to a fair trial. It nevertheless seems arguable, if not obvious, that such a right does exist. By convicting and incarcerating somebody for a crime, the state is plainly depriving that person of his liberty. And withholding evidence that tends to prove the person is in fact innocent of that crime is, in the court's mind, a fundamental denial of due process.

near an end to disclose it; or whether they were required to turn it over immediately. Unfortunately for Gauger, the case law provides no answer to this question, let alone a clear one, which means the prosecutors are entitled to qualified immunity.

The few cases that actually discuss the state's duty to disclose exculpatory evidence during post-conviction proceedings (albeit in terms of Brady) simply do not address the timing question. It appears instead the state in these cases never disclosed the evidence at all, leaving the criminal defendant to find out about it on his own. See Roberts, 115 F.3d at 819; Houston, 978 F.2d at 365; Monroe, 690 F. Supp. at 522. In short, the court is not aware of any cases (and certainly none before 1996) that establish _when_ a prosecutor must turn over exculpatory evidence obtained during the pendency of a direct appeal or some other post-conviction proceeding.

Gauger, however, does cite a case for the proposition that prosecutors must provide Brady material to a defendant as soon as it becomes known to them. See United States v. Kipp, 990 F. Supp. 102, 104 (N.D.N.Y. 1998). Besides the fact that this seems to contradict the well-established rule that a prosecutor can satisfy his Brady obligations by waiting until the trial itself to disclose the exculpatory evidence, see, e.g., United States v. Grintjes, 237 F.3d 876, 880 (7th Cir. 2001), the court again questions the usefulness of analyzing the present case in Brady terms. Even so, Gauger cannot draw any support from the Brady

line of cases. As the court in <u>Grintjes</u> explained, there is no
<u>Brady</u> violation where the exculpatory evidence was disclosed "in
time for the defendant to make use of it." <u>Grintjes</u>, 237 F.3d at
880. By analogy, suppose in July 1996 the prosecutors disclosed
the exculpatory evidence but did not agree to release Gauger. In
that situation, he still could have made full use of the
information to obtain his own release. Nothing in the
prosecutors' delay in turning over the evidence would have
prevented him from doing so. To repeat, though, the court does
not find this analogy particularly helpful because, while his
appeal was pending, Gauger was sitting in jail, having already
been convicted of murder, and every day the prosecutors withheld
the evidence was another day he was deprived of an opportunity to
use that evidence to gain his liberty. No similar concerns are
present in the pretrial <u>Brady</u> context.[4]

Gauger also worries that allowing any delay at all would
mean a prosecutor could potentially suppress exculpatory evidence
for nearly the entire pendency of a defendant's direct appeal,

---

[4] This is also why the court cannot accept the prosecutors'
analogy to a <u>Brady</u> line of cases that say a defendant is not
denied a fair trial, despite the nondisclosure of exculpatory
evidence, if the charges are ultimately dropped before trial or
the defendant is acquitted at trial. <u>See</u>, <u>e.g.</u>, <u>Morgan v. Gertz</u>,
166 F.3d 1307, 1310 (10th Cir. 1999); <u>Flores v. Satz</u>, 137 F.3d
1275, 1278 (11th Cir. 1998) (per curiam); <u>McCune v. City of Grand
Rapids</u>, 842 F.2d 903, 907 (6th Cir. 1988). That is, the fact
that Gauger ultimately succeeded in his appeal did not cure the
injury he suffered from not having the exculpatory information
sooner. This injury would have occurred regardless of whether
Gauger won or lost his appeal.

which could take years, even though the defendant could have
collaterally attacked his conviction in the meantime with the
evidence and been released from jail long before the appeal is
decided. (Pl. Resp., p. 12) To a certain extent, the court
shares Gauger's concern. It even wishes to express its own
disapproval of how his situation was handled. The prosecutors
certainly can be faulted for unnecessarily delaying the
disclosure of evidence that tended to prove the innocence of a
man whom they had prosecuted for murdering his parents and who
was serving two life sentences.[5] That the prosecutors told
Gauger about the exculpatory federal information in July 1996
without disclosing any of the details proves they were able to
come up with a solution to accommodate both his right to know
about the evidence to secure his release at that time and the
risk to Quinn's life if too much of the information was revealed.
There is no reason why the prosecutors could not have done this
sooner, especially after the state appellate court reversed
Gauger's conviction, because nothing had changed between then and
July 1996 (except that they continued to receive *more* exculpatory
information).

Be that as it may, the fact remains that no authority

---

[5]  As the <u>Houston</u> court pointed out, such conduct also could
very well have violated Rule 3.8(b) of the Illinois Rules of
Professional Conduct, which requires public prosecutors to make
"timely disclosure to counsel for the defendant . . . of the
existence of evidence, known to the prosecutor . . ., that tends
to negate the guilt of the accused . . . ." <u>Houston</u>, 978 F.3d at
369 (quoting Ill. S. Ct. R. 3.8(b)).

existed in 1996 that would have given the prosecutors fair
warning that waiting some two to three months (from when they
obtained the second transcript) to turn over the federal
information as the appellate process ran its course, rather than
doing so as soon as they learned about it, violated Gauger's
constitutional rights.  Nor can it be said (and Gauger does not
argue) that such a delay in disclosing exculpatory evidence
during the pendency of a criminal defendant's appellate court
proceedings so obviously violated Gauger's due process rights
that prior precedent was unnecessary to put them on notice that
their conduct violated the Constitution.  See generally Hope, 122
S. Ct. at 2516.  Therefore, the court finds the prosecutors are
entitled to qualified immunity on Count 3.

**D.    State Law Claims against All Defendants (Counts 8-13)**

     With all of the federal claims giving this court original
jurisdiction now dismissed in their entirety, the court declines
to exercise supplemental jurisdiction over the remaining state
law claims.  See 28 U.S.C. § 1367(c)(2); Contreras v. Suncast
Corp., 237 F.3d 756, 766 (7th Cir.) (relinquishing pendent
jurisdiction once federal claims drop out before trial is the
norm, not the exception), cert. denied, 122 S. Ct. 62 (2001);
Estate of Allen v. City of Rockford, No. 99 C 50324, 2002 WL
426117, at *7 (N.D. Ill. Mar. 15, 2002) (Reinhard, J.).

## IV.  CONCLUSION

For the reasons stated above, the detectives' and prosecutors' motions for summary judgment are granted in part and denied in part.  Gauger's remaining federal claims (Counts 1, 2, 3, and 5) are dismissed; with all of the federal claims contained in the amended complaint now dismissed in their entirety, the court declines to exercise supplemental jurisdiction over the remaining state law claims.


**E N T E R:**


_____
**PHILIP G. REINHARD, JUDGE**
**UNITED STATES DISTRICT COURT**


**DATED:** _September 24, 2002_